IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
02 MAR 28 PM 3:32
U.S. DIST. COURT
N.D. OF ALABAMA

| | |
|---|---|
| IVORY J. HAMILTON, | ) |
| Plaintiff, | ) |
| v. | ) CV 00-PT-1382-E |
| JAIL ADMINISTRATOR KEN FLOWERS and JAILER RITA ELSTON, | ) |
| Defendants. | ) |

ENTERED
MAR 28 2002

## MEMORANDUM OPINION

Ivory J. Hamilton, hereinafter referred to as plaintiff, has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at the Talladega County Jail in Talladega, Alabama. Plaintiff names as defendants Jail Administrator Ken Flowers and Jailer Rita Elston.[1] Plaintiff seeks $500,000 in compensatory and punitive damages for mental anguish, physical pain, and suffering.

In his complaint, plaintiff stated that almost immediately after he was transferred to the Talladega County Jail from FCI Forrest City on January 20, 2000, and assigned to a cell, he was approached by inmates Cornelius James and Kevin Jemison, who threatened to kill him. (Doc. 1). Plaintiff stated that he notified an officer identified only as Officer "L.A." about three hours later. Plaintiff reports that he was moved to another cell later that evening, but he was still not out of danger because most of the cells in the Talladega Jail are open and unlocked. Plaintiff was

---

[1] In his original complaint plaintiff named additional defendants. In an order dated July 24, 2000, all defendants and all claims except plaintiff's claim of cruel and unusual punishment against Ken Flowers and Rita Elston were dismissed.



again threatened by Kevin James on January 23, 2000.  According to plaintiff, he immediately wrote Ken Flowers, the Jail Administrator, and wrote him again on January 26, 2000, but states that he did not receive a response.  On February 5, 2000, Cornelius James and Kevin Jemison entered plaintiff's cell around 1:00 a.m. and assaulted him.  In addition to his claim that Flowers did nothing to protect him from his assailants, he claims that Officer Rita Elston was working the tower and watched the incident, but did not intervene to stop the attack.  (Doc. 1).  As a result of the altercation he was seen by a doctor.  He has bruising and swelling on and around his head.  (*Id.*).

The defendants were ordered to respond to plaintiff's complaints and did so with a lengthy special report, to which they attached affidavits and applicable portions of plaintiff's jail file.  Because inmates have a right to be protected from the constant threat of violence at the hands of other inmates, the magistrate judge filed a report in which he recommended that the defendants' motion for summary judgment be denied and this action be allowed to proceed to trial on plaintiff's claims against the defendants that he had been subjected to cruel and unusual punishment, because there appeared to be a dispute of material fact.  (Doc. 16).  The defendants' objected to the same.  (Doc. 17).  The court adopted the report and recommendation and returned the case to the magistrate judge for further proceedings.  (Doc. 18).

On May 9, 2001, in preparation for trial, the magistrate judge ordered the parties to file pre-trial narrative statements on or before June 15, 2001, and told them specifically what information was to be included in those statements to the court.  (Doc. 20).  The defendants complied with the court order.  On July 18, 2001, plaintiff submitted a document entitled "Plaintiff's Pretrial Narrative Statement" which was merely a copy of the original complaint filed

in May 2000. (Doc. 29). On June 25, 2001, in preparation for trial, the defendants took plaintiff's deposition in the visitor's center of the Federal Correctional Facility in Forrest City, Arkansas.

Based on plaintiff's deposition, the defendants have filed a new motion for summary judgment. They attached the affidavits of Ken Flowers and Rita Elston, along with a copy of Ivory Hamilton's deposition. (Doc. 33). Defendants argue that based on the statements of plaintiff in his deposition, there is no dispute of fact, and summary judgment is due to be granted in their favor. (*Id.*). Plaintiff was notified on January 24, 2002, that he would have twenty (20) days to respond to the renewed motion for summary judgment by filing affidavits or other materials if he chose. Plaintiff was advised of the consequences of any default or failure to comply with FED. R. CIV. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). On March 20, 2002, plaintiff submitted an affidavit in opposition to the defendants' motion. (Doc. 51).

## SUMMARY JUDGMENT STANDARD

Because the special report of the defendants is being considered a motion for summary judgment, the court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FEDERAL RULE OF CIVIL PROCEDURE 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary

judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp*, 477 U.S. 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). "Specific facts" pled in a sworn *pro se* complaint must also be considered in opposition to summary judgment. Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. 317; *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). *See Perry v. Thompson*, 786 F.2d 1093 (11th Cir. 1986). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Parker*, 898 F.2d at 1532.

## DISCUSSION

Plaintiff is complaining that he was subjected to cruel and unusual punishment when the defendants failed to protect him from assault by other inmates. The law is now well established that prisoners have a right to be protected from the constant threat of violence by other inmates and that the failure by prison officials to control and separate prisoners who endanger the

physical safety of others may amount to cruel and unusual punishment of inmates so harmed by fellow inmates. *See Gullate v. Potts*, 654 F.2d 1007 (5th Cir. 1981); *Hopkins v. Britton*, 742 F.2d 1308 (11th Cir. 1984). Prison officials must take reasonable measures to guarantee the safety of inmates. *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).

To establish a deprivation of Eighth Amendment rights, a prisoner must show deliberate indifference on the part of the prison officials to the prisoner's need for reasonable protection from violence. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811, 825 (1994). "Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended 'evolving standards of decency,' thereby rising to the level of a constitutional tort." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S. Ct. 285, 291-92, 50 L. Ed. 2d 251 (1976)). "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a [defendant's] failure to act can constitute deliberate indifference." *Brown*, 894 F.2d at 1537 (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)). The *Farmer* Court defined "deliberate indifference" as requiring more than mere negligence, but less than conduct undertaken to cause harm. *Farmer*, 114 S. Ct. at 1978. As the Court explained:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 1979.

### Ken Flowers

Plaintiff was transferred to the Talladega County Jail on January 20, 2000. When inmates arrive at the Talladega County Jail, they are booked and go through a screening process which includes both psychological and medical screening. Incoming inmates are searched, their personal property taken, given clothes to wear, and assigned to a cell. (Doc. 33, Ex. 2 (hereinafter "Flowers Affidavit")).

The Talladega County Jail has a central control tower in the middle of four sections which house inmates. One section is used for segregation and the other three house inmates. Inmates are assigned to a cell and not given a choice about where they are housed. However, if an incoming inmate has an enemy already incarcerated in the jail, and he tells jail personnel of the problem, then he will not be housed with his enemy. (Flowers Affidavit). Male and female inmates are separated and inmates charged with lesser offenses are housed together. Inmates charged with more serious offenses such as murder, rape, and child molestation are housed together in Section 174, and inmates charged with crimes more serious than misdemeanors, but less serious than murder are housed together. The In-Transit Data Form for plaintiff indicated that he had no history of violence or escape. There were no indications at the time he was placed in the Talladega County Jail that he needed to be separated from any other inmate due to a medical, physical, or mental reason. Plaintiff was housed in Section 174. Cornelius James and Kevin Jemison, the inmates who later assaulted plaintiff, were housed in the same section. (Flowers Affidavit).

The jail also has a section for protective custody. Protective custody is reserved for minors who have been certified as adults, individuals who are mentally or physically unable to be

housed with the general inmate population, and inmates who require protection for some particular reason. Inmates who have been threatened by other inmates are separated. Male inmates often request to be placed in protective custody because it is close to the female section of the jail. For this reason requests for placement in protective custody are reviewed carefully to determine if there is actual merit to the request. (Flowers Affidavit).

Inmates are supervised twenty-four hours a day, seven days a week. They can communicate directly with jail personnel by intercoms which are located in each section. Jail personnel also can turn on the intercoms and listen to the inmates while they are in their cells. (Flowers Affidavit). As already noted, at the time plaintiff was booked into the jail there was no indication of a need to separate him from any other inmate. (Flowers Affidavit). Almost immediately after plaintiff was assigned to a cell he was approached by inmates Cornelius James and Kevin Jemison who threatened to kill him. (Plaintiff's Complaint (Doc. 1)). Plaintiff stated in his complaint that he notified an officer identified only as Officer "L.A." of the threats about three hours after they occurred. Plaintiff was moved to another cell, but claims that most of the cells in the Talladega Jail are open and unlocked so he was not out of danger. On January 23, 2000, plaintiff was again threatened by Kevin Jemison. Plaintiff claims that he immediately wrote Ken Flowers, the Jail Administrator, and again on January 26, 2000, but did not receive a response. On February 5, 2000, Cornelius James and Kevin Jemison entered plaintiff's cell around 1:00 a.m. and assaulted him. Plaintiff filed this lawsuit against Ken Flowers and also Officer Rita Elston, whom he claimed was working the tower and watched the incident but did not intervene to stop the attack.

The questions now before this court are whether the defendants knew of the potential danger to plaintiff and whether they were deliberately indifferent to that potential danger. Based on plaintiff's responses under oath to specific in-depth questioning about this incident, facts which were originally disputed have been clarified to the extent that, even under the favorable standard to be applied in reviewing the motion, the defendants are entitled to summary judgment.

When questioned directly and in detail about the threats and what he told to Jail Administrator Ken Flowers regarding those threats, it is clear that Flowers did not know that plaintiff had been threatened by the inmates who ultimately assaulted him and plaintiff did not tell him why he wanted to be moved to another cell or back to federal prison. In his deposition, in response to questioning, plaintiff states under oath:

> Q. Did Kevin threaten you on that occasion or just make a comment about the TV?
>
> A. Well, he just said, "You ain't gonna run no TV.", and I guess he was really just stating it out in the public that, what he was gonna do to whoever touched the TV. I ain't sayin (sic) he directly to me, but he was sayin (sic) it.
>
> Q. He just made a comment to . . .
>
> A. Yeah.
>
> Q. . . . to other people who may be listening?
>
> A. Yes.
>
> Q. How, many, how many people . . .
>
> A. About ten (10), fifteen (15), somethin (sic) like that.
>
> Q. Was that all the inmates who were in that cell block?
>
> A. Yes.
>
> Q. All right. What was the next occasion of anything out of the ordinary that happened?

A. Well, kept on - - they kept trying - - he kept trying to throw all on the TV, but I had already got word that it wasn't about the TV. Freddie, that guy that was sleepin (sic) in the room with me, had already told me what he was talkin (sic) about doin (sic).

And, the guy who's last name is Swain, I can't remember his first name.

Q. Well, what did Mr. Swain say to you?

A. He just said, "Be careful of what you say around guys because they're goin (sic) back tellin (sic) Jimerson and James what you're sayin (sic). And, they're talkin (sic) about doing somethin (sic) to you.

Q. All right. Did he say what they were going to do to you?

A. He just said, "He's talkin (sic) about doin somethin (sic) to you."

Q. Well, what did you do when you heard that"

A. Well, I had started askin them about when they plan on takin (sic) us back - - takin (sic) me back. They kept talkin (sic) about later afternoon, when I had to go to court. Well, I was like, "Move me to another unit."

Q. All right. Say that again now, you - - -

A. I kept asking the officers, "Well, when are y'all goin take me back?"

Q. You talking about to Arkansas?

A. Yeah, bring me back to Arkansas. They said, "Well, after you go to Court." So, I said, "Move me to another unit."

Q. Who were you asking - - who were you making this - -

A. The Jailers, then I told the Trustee to tell Ken Flowers. But, I never got no response, I kept writing cop-outs to them, but they never would reply for them. It just so happen one day we was goin to court - - all of us was goin (sic) to court together - - me, James and all of us were goin to court together.

That's when I passed Mr. Flowers, myself, personal told him to trans - - to me move.

Q. What did you say to him?

9

A. I said, "Could you move me out of my unit?"

Q. Did you give him a reason for it?

A. I didn't have time, he's so busy, you know, he ain't gonna talk.

Q. And, what did he say?

A. "I'll holler at you later on."

Q. Okay. Is that the first time that you had a conversation with Mr. Flowers, directly?

A. Yes, sir.

Q. When was that, Mr. Hamilton?

A. The day we come back from court,

. . .

A. But, every minute, every day I'm asking them, "When are y'all gonna send me back to Arkansas or when are y'all gonna move me?"

Q. Now, who are you asking that?

A. I'm asking the Jailers. I can't never get a chance, I can't never get a chance to get in touch with Mr. Flowers. Because, he's always not there or he ain't comin back there.

So, I'm askin the Jailers, I'm askin the lady officer, the lady jailer, whatever her name is.

Q. So, you're asking them when are they going to move you back to Arkansas - - -

A. When are they gonna move me back to Arkansas and move me somewhere else.

Q. All right. Did you ever give them a reason why that you wanted to be moved somewhere else?

A. Not to my recollect.

(Plaintiff's Deposition (Doc. 33, Ex. A, pp. 18-23)).

In order to be held responsible for failing to protect plaintiff from assault, Ken Flowers must have known of the danger plaintiff was facing and been deliberately indifferent to that danger. Ken Flowers states by affidavit,

> At no time prior to the incident, did the Plaintiff complain about where he had been placed or alert me or any other jail personnel that he was concerned about his safety. At no time prior to the incident, did the Plaintiff voice any objection to me . . . to being housed in the same section with Mr. Jemison, Mr. James or with any other inmate. At no time prior to the incident, did the Plaintiff alert me . . . that he had any problems with Mr. Jemison or Mr. James.

(Doc. 33, Ex. 2). Plaintiff says that he never told Ken Flowers "why" he wanted to be moved to another unit, and never told Ken Flowers that he had been threatened by the inmates who later assaulted him. Jail Administrator Ken Flowers was not deliberately indifferent to plaintiff's need for protection from Jemison and James since he did not know that they had threatened him. Accordingly, the defendants' motion for summary judgment is due to be granted on this claim and Ken Flowers is due to be dismissed from this action.

### Rita Elston

Plaintiff makes the following complaint about Officer Rita Elston, "[a]s I made my way out of the cell to the intercom by door to call the police, I noticed Defendant Rita Elston watching me. She did nothing to try and stop this incident." (Doc. 1, p. 6).

Again plaintiff must show, with facts, not conclusory statements, that the officer was deliberately indifferent to his need for protection. Plaintiff does not have a constitutional right to have an officer intervene in a fight. Plaintiff does not claim that he ever told Officer Elston that he was afraid of the inmates who ultimately assaulted him or that they had threatened him prior to that time. Plaintiff merely claims that as he was leaving the cell (after he got away from his assailants and went to press the intercom), he saw Elston watching. Officer Elston states by

affidavit that she did not stand and watch the altercation, but once she was alerted to the altercation, she states that she requested assistance from other officers. (Doc. 33, Ex. 3). Elston also states that the windows in the control tower are tinted and the inmates in Sections 170, 171, and 174, as well as the segregation unit cannot see what jail personnel located in the tower are doing. (Doc. 33, Ex. 3). Plaintiff does not dispute Elston's statement that plaintiff could not have seen what she was doing at the time of the altercation. Without specific facts to show that Elston knew of plaintiff's need for protection and that she was deliberately indifferent to that need, plaintiff's conclusory statement that she watched and did nothing to stop the incident fails to state a claim for which relief can be granted. Inasmuch as plaintiff has failed to dispute with specific facts, the statements in Elston's affidavit, she is entitled to summary judgment on plaintiff's claim that she was deliberately indifferent to his need for protection.

## CONCLUSION

Premised on the foregoing reasons, the defendants' motion for summary judgment is due to be granted and this action dismissed with prejudice. An appropriate judgment will be entered.

DATED this 29TH day of March, 2002.

ROBERT B. PROPST
UNITED STATES DISTRICT JUDGE

12